Case number 21-2039, Eastern Arkansas, United States v. Gary Harris. All right, Mr. Bryant, the court appreciates your willingness to accept the appointment in this case under the Criminal Justice Act, and you may proceed with your argument. Thank you, Judge. May it please the court, my name is Greg Bryant. I represent the appellant Gary Harris. We're here today because the district court in the Eastern District of to suppress. What happened is that in late 2019, Mr. Harris was arrested on a criminal complaint and charged with being a felon in possession of ammunition. He was indicted in early 2020. After he was indicted, he filed a motion to suppress and a brief in support that argued the evidence of the ammunition seized from his house was in violation of his Fourth Amendment rights because the police trespassed on his property, forced him outside of his home, illegally detained him, and tricked him into giving him written consent to search his house. Now, the government, of course, says in our law that Mr. Harris's Fourth Amendment rights were not violated, but even if they were, that was okay because the attenuation doctrine applies and the attenuation doctrine, as the court is well aware, is an exception to the exclusionary rule. Mr. Bryant, Judge Kobus here, would you explain the trick him theory? What is it that led to the tricking here? What's the basis of that claim? Thank you, sir. Officer Harden, before Mr. Harris signed two consent to search forms, before each one, he told Mr. Harris, if you assign this consent form and I go into that car and I don't find a gun, this quashes the whole thing. Now, I'll answer your question about what quashing may mean, but then after he went into the car and didn't find a gun, well, that didn't quash the whole thing. Then he went back into the back of a patrol car where Mr. Harris was being held, handcuffed, what he called a crumply-ass patrol car, and Harden continued to interrogate him, continued to accuse him of having a gun inside his house and again said, well, if you'll sign this consent form, let me search your house, that would quash the whole thing. Now, Mr. Harris contends that it was reasonable for anyone who was told by an officer, this will quash the whole thing, means that I'm going to let you go and no charges will ever be filed. But instead, after searching for a gun, they've never found yet, they did find ammunition inside his house. They found multiple rounds of ammunition inside his house. And Mr. Harris said he forgot the ammunition was there, but that's what we asked the court to suppress. And so our position is, and I think it's, he was made promises that didn't let him go, and they didn't let him go. Now, after the district court entered an order denying his motion to suppress, the order says, and I bring this to the attention of the court, not as a matter of an issue on appeal or a reason to reverse, but as a concern that I have that I want to mention to the court, and that is that the district court did not make a specific finding that Mr. Harris' constitutional rights were violated, his Fourth Amendment rights were violated. And what is concerning to me is that I've never known of a court to attenuate a legal stop or a lawful stop or a lawful, you know, encounter one that doesn't violate the Constitution. So I worry that the record is not, the entire record is not on appeal, and the court's being asked to determine if a mistake has been made when you, that attenuation was, applies to what, we don't know whether the court ruled that it was a constitutional or a Fourth Amendment violation or not. And I didn't just dream that up at all, but prepared for my brief, and Yusef, Judge Morris-Arnold, commented about a similar thing, that the court was being asked to make a de novo review and see if a mistake had been filed when the record was incomplete. But I'll, with the court's permission, I'll go on. Since you've raised the point, though, let me make sure I understand where it goes. I understand the concern about a court trying to decide something when the record is incomplete. But my understanding here was that there's a complete record, that is, there's a complete factual record as to what the evidence is. And Judge Baker just said, I'm going to assume for the sake of analysis that there was a violation, because if there were a violation, I would have to resolve the that, because I think that allows for the evidence to come in, and it's unnecessary to say one way or the other whether there was a constitutional violation. That is different, isn't it, than an incomplete record. That's just a form of legal analysis. Judge, I am sure that being a appellate court judge, you have the understanding and the dynamics far better than I do. I just want to clarify whether you think there's some additional material that should be in the record, or if you're just referring to the legal conclusion. Yes, that is correct. I'm just referring to the legal conclusion. All right, thank you. Go ahead with your argument. Thanks, sir. Now, I want the court to know that we come here knowing that this court rarely, if only once a night that I could find, has found that a district court misapplied the attenuation doctrine and reversed the denial of a motion to suppress it, and that was in Youssef. But this case is different, and I think it's different because of the circumstances that surrounded Mr. Harrison in the back of a patrol car, but I also think it's different in the sense that after when Judge Kelley and Judge Colgis decided Lowry, there was some room given when Judge Colgis wrote that a street doesn't make a per se analysis, and we have to look at these things on a case-by-case basis. And what I mean by that is the attenuation problem of temporal proximity. Now, Streiff called temporal proximity a more clearly understood word, that that would be a remoteness. But this court has held on multiple occasions that 4 minutes, 10 minutes, 15 minutes, in this case it was 34 minutes. That is a sufficient lapse of time in which the court can find that Mr. Harris had the opportunity to collect his thoughts, make a second sober thought, or make a detached reflection of his circumstances, because Mr. Harris or anyone in his position who is put on an egg timer that if you don't, you better make your decision right now, or you're going to put yourself in a position where you're going to allow evidence that would otherwise not be admissible against you to come in and send you to prison. Mr. Ryan, I have a question about the initial seizure. As I understand your argument, you believe that the seizure took place within the house, correct? I think that the district court said it was likely that he was actually arrested in his house, is that correct? Judge, that is my position, but I think there is enough there to say that if the court decided that exigent circumstances allowed him to pull him out of the house because there was a court-reported shooting, then the seizure at least took place after he was in handcuffs and at the time he was escorted to the back of the patrol car. To follow up on that, do you contest the probable cause? I understand you say it was an unlawful warrantless arrest. Do you contest that there was probable cause to believe that he was the person that they were looking for in the shooting? Judge, I do, and I think Judge Baker, she said that there was probable cause to believe that he was, at least probable cause to investigate or reasonable belief to investigate. The 911 caller was not asked if the person who stepped out of the porch positively identified, that is the man who shot that dog. Now, did the 911 caller say he was a big man, I think she said he had a big belly? Did he go into that house, which is the house that Mr. Harris walked out of? Did he put something in the grand marquee that the police did not at that point verify that he owned that house? Mrs. Perez didn't see who shot. There are some questions, and I don't want to sound disingenuous by saying that they didn't have some significant suspicions, but does it rise to the level of probable cause? I'm not going to argue that the judge is wrong about that. I don't know if I answered your question. I think you're saying that you're not contesting that finding, that there was probable cause to believe that he was the one who they were looking for in connection with the shooting. Thank you. Okay. Regarding the, again, regarding the attenuation doctor, what I think Lowry was getting at, I think, was that when you have temporal proximity remoteness, and the facts favor suppression, but at the same time, you have an intervening circumstance. Both of them are present, and what's the tie vote? I think the tie vote is the police flagrancy, and I think the police flagrancy issue really comes from the concept that this traditionally created rule of attenuation is only as good as society is willing to benefit or can benefit from suppression versus deterrence. And I think that both of these elements of the attenuation doctor require an analysis of if there was any police misconduct that affected them in any way. And I think that regarding his voluntary consent, as Judge Cota said, actually, I think there's lots of trickery involved, and I realize that the rulings have been that the elements to decide voluntary consent are all treated equally. But I kind of think it's kind of like what Judge Helita said in Jardine's. They're all equal, with the exception that one is first among all. And I think that the promises made to consent is the first consideration above all. All right. Your time has expired. Thank you for your argument. Ms. Bryant, we'll hear from you for the government. Thank you, Your Honor. And may it please the court, my name is Kristen Bryant, and I represent the United States in this case. And just to touch on the issue where Mr. Bryant left off about the term trickery and whether there was any trickery in this case, and the instance to which he's referencing about the use of the word squash, if the court looks at the video at approximately the 11 minute and 6 second mark, the way that this came into play is Mr. Hartin, or Officer Hartin is talking to Mr. Harris, and he tells him, I can even tell you where the gun is at. Mr. Harris responds, I'm listening. And Mr. Hartin says, you put it in that mercury. And Mr. Harris, who's the first one to bring up the issue of searching the vehicle, says, let me open the mercury for you. Mr. Officer Hartin then responds, are you giving me consent to search your vehicle? Mr. Harris tells him he wants to open the car, and Officer Hartin says, will you sign a consent for me to look in the mercury, and that will kind of squash the whole thing. So it wasn't posed to Mr. Harris as, if you let me search your vehicle, this whole issue is squashed. There was no promise made. It was actually Mr. Harris that initiated the idea of searching the mercury. And Officer Hartin simply followed up with that by saying, let us sign this consent form. There were no promises made. I think it's a mischaracterization to state that he tricked Mr. Harris into that, and that Officer Hartin promised that the whole issue would be done if they searched in the vehicle. As it relates to the search of the residence, there were no statements like that made. And actually, Officer Hartin followed through with what he said when he told him, Mr. Harris I believe said, or excuse me, Officer Hartin asked Mr. Harris at the 33 minute mark, will you give us permission to search the house? It will really help us squash this. Mr. Harris said, that will be fine now, and then asked to get out of the vehicle. And what happened, they found the ammunition in the house, and Mr. Harris was not arrested. He was allowed to go about, and they seized the ammunition. So there were no promises or inducements to get Mr. Harris to voluntarily consent in this case. As the facts of this case, I think it's a very fact-intensive case. And on the afternoon of December 14th of 2019, officers with the North Little Rock, Arkansas Police Department received information that a dog had been shot in a neighborhood, excuse me, by a neighbor in a residential neighborhood in front of a woman and her children. When they arrived, they learned that a man believed to be Mr. Harris walked out of his residence at 104 South Spruce Street with a firearm, walked up to a golden retriever puppy who was laying in the street, shot the dog in the head, walked over to his vehicle, opened the driver's side door of the vehicle, and then retreated to his residence. The district court did not err in denying Mr. Harris' motion to suppress. Specifically, the court's finding that the attenuation doctrine rendered the application of the exclusionary rule inappropriate because there was sufficient attenuation to warrant a denial of the motion to suppress. When looking at the three factors that this court considers in attenuation, there's the temporal proximity between the illegal search or seizure and the consent, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct. This court has continuously held that 15 minutes, 10 minutes is sufficient temporal proximity to purge the taint of any illegality, which we are not conceding there was any illegality or any Fourth Amendment violation. The consent in this case that really matters was the consent to search the residence, which was approximately 34 minutes after officers made contact with Mr. Harris. But Mr. Harris had also previously provided both verbal and written consent about 14 minutes after he was encountered by the law enforcement officers. And then the incriminating statements that he made concerning the ammunition were not made until almost one hour after officers had initially come into contact with Mr. Harris. I know that Mr. Bryant in his brief relies on strife. I would just note to the court, this court, that Judge Baker was obviously aware of strife. She cited it in her order in finding the temporal proximity. And strife certainly didn't overrule this court's precedent. And this court has relied on strife in cases that we cite, specifically Wisenton and Reiselman, after strife was decided. And looking at the presence of the intervening circumstances, I would note to the court that Mr. Harris was immediately given his Miranda rights after officers made contact with him. It was a minute into the video. He gave consent twice, both verbal and written. And in those consent forms that he signed, it told him, you know, you do not have to give consent to search. He questioned the officers about the search of his residence, asking them if they were going to tear his house upside down, which shows that he clearly had time to consider the search and what was going to happen during the search of his house. And I note during the video that Mr. Harris sat there on the couch the entire time that officers searched his home. And you can hear some of the background conversations that he's having with the officers, talking about the weather, about his home, about the temperature at which he sets his house. And so, all of these are significant intervening circumstances to attenuate any potential tank that existed. What about counsel, when you say... Go ahead, Judge Costin. No, I defer. You said all of these are intervening circumstances. When you say all of these, are you focusing in on the consent form? What is it that you're actually relying on as the intervening circumstance? Because it seems like this is strife, strife. This is not the wholly independent circumstance that they had in that case. So, can you focus for me instead of sort of just all of these things and tell me what you think the intervening circumstance or circumstances are that support the district court's ruling? Absolutely. I think first is the giving of the Miranda warnings, right off the bat, admitted in. When they read him his Miranda warnings, he agreed to provide a statement. The fact that he gave consent 14 minutes in, was given a form. And like I said earlier, that he was the one who initiated the consent conversation. Then, the second consent that he gave at around 34 minutes, to search the house. And then, the fact, you know, he asked the officers during the video, I want to get out of the car, I want you to move my cuffs to the front. Just all these different intervening circumstances that existed. I know in some of the cases... I want to follow, just follow, the asking that I want out of the car, how is that an intervening circumstance? As a legal matter, what significance does that have? I believe that he was, there was essentially a change, I would say a change of scenery almost. Because he was in the police car, then he was allowed to get out of the police car, go stand outside, watch them search his vehicle. And I note, and I can't remember which case it was right now, but this court said the fact that they allowed the defendant, in that case, to go smoke a cigarette, constituted an intervening circumstance. So I just think all of these, considering the totality altogether, again, constitutes intervening circumstances. And the fact, too, that when he sat there, he never revoked his consent, was aware of what was happening the entire time, and again, sat there, having knowledge of what was going on, all supports the presence of intervening circumstances. Now, if I could raise my question now. As I recall, after the search of the car, Harris was returned to the patrol car. Yes, Your Honor. And is it a concern here that, if we assume that he was unlawfully arrested because they unlawfully entered the home or summoned him out of the home without a warrant, is it a concern that he's basically saying to them, I want to get out of this small patrol car where I'm handcuffed and unlawfully arrested, and the quid pro quo is basically, you let us search your house and we'll let you go. Does that undermine the attenuation of the search of the home? I don't believe so, Your Honor, because again, I think the record before the court shows that Mr. Harris had the opportunity to consider what was happening, understood what was happening, and looking at the voluntariness of his consent and the factors when considering the voluntariness of his consent, his age, he's a 49-year-old male, his general intelligence, the fact that he was not intoxicated, the fact that he had been arrested multiple times and was familiar with the criminal justice system, I think all those go to show that that consent was voluntary and it wasn't forced by the officers at that time. And kind of ending where we ended with Mr. Bryant, looking at the purpose and flagrancy of the official misconduct, the court has stated that that's the most important factor because it goes directly to the purpose of the exclusionary rule, which is to deter police misconduct. The district court found there's no indication or allegation in this case that the North Little Rock officers were not acting in good faith. The officers had received credible information that an individual matching Mr. Harris' description that walked into Mr. Harris' home had shot a dog in a residential neighborhood in front of a woman and her children. The officers did not force their way into the home and they waited for Mr. Harris to come out. In watching the video, I think it's obvious that Mr. Harris was not under duress. Again, he sat on the couch and he talked. The officers were extremely cordial to him, thanking him on multiple occasions for his cooperation. After Mr. Harris came out of the home, they never raised their voices. They just continued to appreciate Mr. Harris' consent. I don't believe that there's any record before this court that the officers acted with purposeful or flagrant misconduct. Unless the court has any other questions, I would surrender the balance of my time. Seeing no further questions, we thank you for your argument. Mr. Bryant, you used all of your time, but since Ms. Bryant seated back some time, we'll give you one minute for rebuttal. Thank you, Judge. Hold on. Let the clerk set the clock. There we go. You may proceed. I'm assuming that the court did watch the video, but remember what was said, not in front of Mr. Harris, but behind his back. Remember what the officer Steele said. Officer Steele said, what needs to happen is Denise, meaning Lieutenant Lacey, needs to go get a search warrant and tear this place apart. After Harden came back from the unsuccessful search of the car and didn't quash the whole thing, after that, that's when he obtained another written consent form and it was his purpose. It was to get into that house to find a gun that did not exist. They said what was going to happen and if they could tear it apart, they would. All right. Thank you for the arguments. Thank you to both counsel. The case is submitted. The court will file a decision in due course. Thank you, Judge. Thank you.